## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**V**                                    **INDICTMENT NO. 1:05-CR-00342-RCL-5**

**GARETH LEWIS,**                        **ORAL ARGUMENT REQUESTED**

    **Defendant**

### DEFENDANT GARETH LEWIS' PRELIMINARY MOTION TO DISMISS

COMES NOW the Movant Gareth Lewis, and pursuant to Article III of the United States Constitution, and F.R.Cr.P. 12 and 18, moves this Court to dismiss the instant indictment against him as more fully shown hereinbelow.

### I.  INTRODUCTION

By sealed Superseding Indictment (Doc #6), Movant Gareth Lewis (hereinafter "Lewis" or "Movant") stands charged with one count of conspiracy to distribute five kilograms or more of cocaine intending and knowing  that the cocaine would be unlawfully imported into the United States in violation of Title 21, USC Sections 959 and 960.[1]

Lewis is also charged with distributing five kilograms or more of cocaine intending and knowing that the cocaine will be unlawfully imported into the United States in violation of Title 21, United States Code, Section 959.

---

[1] The material allegations of the indictment itself alleges violations of 959 and 960.  The **summary** of the charge alleges 959, 960 **and 963**, as well as 18 USC 2.

Specifically, the indictment alleges that from April of 2005 until the return of the Superseding Indictment, the charged defendants "in Columbia, and elsewhere" conspired to distribute five kilograms or more of cocaine that they knew and intended to be imported into the United States. No further detail is provided in the indictment, viz: the indictment contains no "objects" of the conspiracy; no "manner and means" of committing the conspiracy; no "overt acts" associated with the conspiracy; nor any outline of the roles in the conspiracy any defendants are alleged to have played.

Likewise, the substantive count alleges that in July of 2005 "in Columbia and elsewhere" the defendants distributed or caused to be distributed five kilograms or more of cocaine that they knew and intended to be imported into the United States. As in the conspiracy count, no further detail is provided.[2]

It appears that venue in the District Court of Columbia is predicated on 21 USC 959(c), which provides that one who distributes drugs outside the United States knowing or intending that the drugs will be eventually imported into the United States "shall be tried in the United States District Court at the point of entry **where the person enters the United States**, or in the United States District Court for the District of Columbia." (emphasis added).

As demonstrated below the superseding indictment is duplicitous. Further, Lewis neither entered the United States in the District of Columbia,

---

[2] Once again the body of the indictment contains **no** statutory reference, only the **summary** of the charge contains a statutory reference.

nor committed any acts associated with the alleged conspiracy in the District of Columbia. Article III of the Constitution gives Lewis the right to be tried "in the State where the (conspiracy) shall have been committed" (i.e. where Lewis **entered** the United States). Thus Lewis has a right – indeed a constitutional right – **not** to be tried in the District of Columbia on the conspiracy count.

## II.    BACKGROUND

As it relates to Lewis, starting in May, 2005, interception warrants were issued by a Judge of the Supreme Court of Jamaica which allowed the interception of phone calls made and/or received by Lewis. Primarily, these phone calls originated and were received in the country of Jamaica. Subsequent interception warrants were issued, for several phone numbers, through June of 2006.

The Government contends that lead defendant Alvaro Serrano Archbold-Manner ("Archie") was the head of a drug trafficking organization which smuggled – or attempted to smuggle – multi-kilo quantities of cocaine from Columbia to Central America and Mexico.[3]  *See* **Affidavit in Support of Request for Extradition of Gareth Daviton Lewis, by Angelica Gurrola, *Special Agent, DEA*** (hereinafter "Gurrola Affidavit"), Exhibit D to the Affidavit of AUSA Patrick Hearn in support of the extradition of Lewis, paragraphs 5-6, pp. 2-3.

---

[3] Of course, the Government then alleges that from Mexico the drugs were for "eventual delivery to the United States".

The organization is alleged to operate as follows:

+ Cocaine is transported from cocaine laboratories in Columbia to the northern coast of Columbia.

+ Multi-kilo quantities of cocaine would be loaded on "go-fast" boats [**see, e.g. United States v Martinez**, 476 F.3d 961, 964 (D.C. 2007) ("go-fast" boats used to "receive the cocaine from large vessels coming from Columbia.")]

+ Those boats would transport the cocaine "out to the Caribbean Sea" where they would meet larger maritime cargo ships.

+ The cocaine would be transferred to the cargo ships, which would transport the cocaine to Central America or Mexico.

**See** Gurrola Affidavit, paragraph 6, pp 2-3.

Lewis is alleged to be a provider of cargo ships which facilitated the transfer of cocaine from the "go-fast" boats to Central America or Mexico.   **Id.**

Specifically, Lewis was alleged to run a shipping company, Ocean Marine, Ltd. based in Jamaica.  According to the Government, one of the vessels owned by Ocean Marine was the Dan Viking, which in March of 2006 was "interdicted and seized" in international waters with approximately 2,500 kilos of cocaine aboard.  Gurrola Affidavit, paragraph 7, 9, pp.3-4.

The Gurrola Affidavit, outlining the Government's case relating to Lewis, provides that as a result of wire interceptions, surveillance, and searches conducted in Jamaica, the Government found evidence which leads them to believe that

+   Lewis haD ties to the Dan Viking (Gurrola Affidavit, paragraph 11)

+   Money was delivered **in Panama** (Gurrola Affidavit, paragraph 11)

+   Western Union receipts for money transfers **to Panama** (Gurrola Affidavit, paragraph 12)

+   Travel itineraries and boarding passes indicating **travel to Panama** in June of 2005 and August of 2005 (Gurrola Affidavit, paragraphs 13 and 14);

+   Surveillance of Lewis **meeting in Mexico** with Archie (Gurrola Affidavit, paragraph 14) (emphases added)

**Nota bene**: The Gurrola Affidavit alleges that Lewis was kidnapped in Mexico and held as collateral for a seized shipment of cocaine. But, in August of 2005, Lewis "escaped from the Mexicans and returned via commercial airlines from Cancun, Mexico to **Miami, Florida**". (Gurrola Affidavit, paragraph 14, pp. 6-7.) (Emphasis added).

Apparently, the Dan Viking was a Panamanian-flagged Motor Vessel, and was in international waters in the Caribbean Sea when boarded by the United States Coast Guard in March of 2006. ***See* Affidavit of Lieutenant (Jr. Grade) Marc McDonnell, in Support of Request for Extradition of Gareth Lewis.**

Two alleged incidents make up the entirety of Lewis' connection to the United States. They will be outlined below ***seriatim***.

**(A)    May 2005**

Intercepted phone conversations in July of 2005 led investigators to conclude that Lewis was involved in the transportation of a shipment of cocaine

which was delivered in Miami, Florida by a Cuban National.  The Cuban

National disappeared with the shipment and Lewis was left holding the tab.[4]

***See* Affidavit of Horace Carr in Support of Request for Extradition of**

**Gareth Lewis (Exhibit H) paragraph 7, pp. 7-8; Affidavit of Strey-Ann Vylett**

**in Support of Request for Extradition of Gareth Lewis (Exhibit L) paragraph**

**7, p. 4**.

      **(B)    <u>July 2005</u>**

According to the Gurrola Affidavit, in July of 2005, the Columbia Coast

Guard interdicted a "go-fast" vessel in Columbian waters and seized 1500

kilograms of cocaine.  Gurrola Affidavit, paragraph 8, p. 4.  According to that

same source, Lewis was kidnapped and held "as collateral for the loss of the

cocaine shipment on July 22, 2005."  Gurrolla Affidavit, paragraph 14, p. 7.[5]

Once he escapes, Lewis apparently catches a commercial flight to Miami

and the intercepts allegedly indicate that Lewis **"was here (in Miami)"**.  ***See***

***Carr*** Affidavit, ***supra***, paragraph 10, p. 7. (Emphasis added).

That is, Lewis' connection to the United States is his entry into the United

States in Miami, Florida – the Southern District of Florida.  Accepting

---

[4] Whether this incident, even if true, had anything to do with the conspiracy alleged in the indictment is unclear as the alleged incident is never factually tied to the Archbold organization.

[5] This interpretation is highly suspect, in that the intercepted calls – according to the Vylett Affidavit – discussing Lewis' kidnapping related to the loss in Miami, **not** the July 22, 2005 "go-fast" interdiction.

*arguendo*, the Government's interpretation of the intercepted calls,[6] Lewis'

entered the United States in Miami, Florida and engaged in a specific

transaction in Miami, Florida.

### III.   ARGUMENT

### (A)   DUPLICITY OF THE SUPERSEDING INDICTMENT

### 1.   The Charges in The Superseding Indictment.

Count I charges Lewis

> From in or about sometime in April 28, 2005, the exact date
> being unknown to the Grand Jury, and continuing thereafter,
> up to and including the date of the filing of this Indictment,
> in Columbia, an elsewhere, the defendant, **ALVARO SERRANO
> ARCHIBALD-MANNER, a.k.a. "El Negro," a.k.a. "Archie"
> JESUS ANTONIO MURILLO-LENIS, a.k.a. "Leni" a.k.a.
> "Muri"** and **RANFER MANUEL RIO-MERCADO, JEFFREY
> LEWIS, GARETH DAVITON LEWIS a.k.a. "David Lewis",
> FREDY GOMEZ-PEREZ, a.k.a. "Chiqui", JUAN DE JESUS
> RINCON-ROJAS a.k.a. "Paisa" GUSTAVO BARBOSA-
> RODRIGUEZ, ULYSIS MALKIN a.k.a. "Ulysis Malcom",
> a.k.a. "Ulyses Malcolm", a.k.a. "Ulises Malkum", CARLOS
> DELGADO-GOMEZ a.k.a. "Calanga"** and unindicted co-
> conspirators, known and unknown, did lawfully, knowingly
> and intentionally combine, conspire, confederate and agree
> together with each other and with other persons known and
> unknown to the Grand Jury to distribute five kilograms or
> more of a mixture and substance containing a detectable
> amount of cocaine, a Schedule II controlled substance,
> **intending and knowing** that such substance would be
> unlawfully imported into the United States, in violation of Title
> 21, United States Code, Section 959 and 960.
>
> **(Conspiracy to Manufacture and Distribute Five Kilograms or
> More of Cocaine Intending and Knowing that the Cocaine Will
> Be Unlawfully Imported Into the United States**, in violation

---

[6] Of course, nothing in these motions should be considered as a direct or indirect admission by Lewis of any of the
acts described in the discovery materials or alleged in the indictment.

of Title 21, United States Code, Section 959, 960 and 964 and **Aiding and Abetting**, in violation of Title 18, United States Code, Section 2).

Count II charges Lewis as follows:

> On or about July 22, 2005 in Columbia and elsewhere, **ALVARO SERRANO ARCHIBALD-MANNER, a.k.a. "El Negro", a.k.a. "Archie", JESUS ANTONIO MURILLO-LENIS, a.k.a. "Leni", a.k.a."Muri"** and **RANFER MANUEL RIO-MERCADO, JEFFREY LEWIS, GARETH DAVITON LEWIS a.k.a. "David Lewis" FREDY GOMEZ-PEREZ, a.k.a. "Chiqui", JUAN DE JESUS RINCON-ROJAS a.k.a. "Paisa", ULYSIS MALKUN a.k.a. "Ulysis Malcom", a.k.a. Ulyses Malcolm" a.k.a. "Ulises Malkum", a.k.a. "El Gordo" and CARLOS DELGADO-GOMEZ a.k.a. "Calanga"**, did unlawfully, knowingly, and intentionally distribute and cause the distribution of five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, ***intending and knowing*** that such cocaine would be unlawfully imported into the United States.
>
> **Distributing Five (5) Kilograms or More of Cocaine Intending and Knowing that the Cocaine Will be Unlawfully Imported Into the United States**, in violation of Title 21, United States Code, Section 959, and **Aiding and Abetting**, in Violation of Title 18, United States Code, Section 2). (Emphasis added to italicized highlighted portions, otherwise, emphasis in original).

The operative statute is Title 21, United States Code §959, which in pertinent part provides as follows:

> (a)  Manufacture or distribution for purpose of unlawful importation
>
> It shall be unlawful for any person to manufacture or distribute a controlled substance in Schedule I or II or flunitrazepam or listed chemical –

(1) **intending** that such a substance or chemical will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States;

(2) **knowing** that such substance or chemical will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States.

\* \* \* \* \*

(c)  Acts committed outside territorial jurisdiction or United States; venue

This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States.  Any person who violates this section **shall be tried in the United States district court at the point of entry where such person enters the United States, or** in the United States District Court for the District of Columbia. (Emphasis added).

## 2.    <u>The Vice of Duplicity</u>

Duplicity is the joining in a single count of two or more distinct and separate offenses.  *United States v Hubbell*, 177 F.3d 11, 14 (D.C. Cir. 1999) [citing *United States v Mangien*, 694 F.2d 1270, 1281 (D.C. Cir. 1982)].  A duplicitous indictment is a veritable hydra-head of vices:

+    The jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense.

+    Such a result conflicts with a defendant's Sixth Amendment rights.

+    Such a result may also prejudice a subsequent double jeopardy defense.

In short, such considerations reflect fundamental due process rights of defendants, thus inhibiting the otherwise broad prosecutorial discretion in the drafting of indictments.  Lewis suggests that the instant indictment suffers from the vice of duplicity as set forth hereinbelow.

### 3.    Title 21, United States Code, Section 959(a) Criminalizes Two Distinct Offenses

We start with the language of the statute itself.  Second 959(a) prohibits the manufacture or distribution of a schedule I or II controlled substance:  (1) **intending** that the substance will be unlawfully imported into the United States; **or** (2) **knowing** that the substance will be unlawfully imported into the United States.  On the face of it, the statute is framed – not in a single paragraph – but in separate subsections each defining a distinct offense.

Given the distinct subcategories of the statutory framework, it is reasonable to conclude that Congress was concerned with prescribing particular **kinds of conduct** rather than the **particular result**.  That being so consistency calls for interpreting the enumeration of different kinds of conduct as reflecting different offenses, **not** different modes of achieving a non-existent result.

This distinction is bolstered by this Circuit's authority in construing 959(a)(2).  In ***United States v Chan Chun-Yin***, 958 F.2d 440 (D.C. Cir. 1992), the defendant was convicted of selling a kilogram of heroin in Hong Kong "with the knowledge that it would be imported into the United States."  In charging

the jury, the Court advised the jury that a violation of 959 could be found if the defendant "knew **or had cause to know**" (emphasis in original) that the heroin would be unlawfully brought into the United States.  ***Id.***  The Government acknowledged this instruction was error.  The Circuit agreed, finding

> By its terms, this provision requires proof of actual,
> not constructive, knowledge.

> ***Id.*** at 443.

The terms of the statutory language are, perforce, clear:  **actual knowledge** is required **or intention**:  and these are both practically and conceptually distinct.

This section is part of the 1970 Comprehensive Drug Abuse and Prevention and Control Act of 1970 which sought, ***inter alia***, to provide "more effective law enforcement aspects of drug abuse and control "and to provide "an overall balanced" scheme of penalties.  HR No. 91-1444, Sept 10, 1970.  A large part of the Act, however, provided for increased efforts in drug abuse prevention and rehabilitation.   The act was designed to coalesce the "plethora…of more than 50 pieces of legislation…(which) has given rise to a confusing and often duplicative approach" to the problem of drugs and drug abuse.  ***Id.***  that is, Congress enacted a comprehensive act dealing with a number of separate and distinct issues – abuse, rehabilitation, control, punishment, licensing and administration (a so-called "closed system").  Thus, the act was an attempt at an amalgamation of the formerly "confusing and often duplicative approach" of

over 50 pieces of legislation.  This section clearly contemplates two separate
offenses combined into 959(a).

Are the subsections distinctly different kinds of conduct – does one's
intention differ from one's actual knowledge?  Of course, otherwise the two
subsections are redundant – and Congress has manifested its intention and
understanding that the two components represent separate and distinct
conduct.

### 4.     Analogy to Title 18, United States Code Section 924(c) Is Appropriate

The issue of whether or not 924(c) criminalizes two distinct offense
presents a direct analogy to the issue **sub judice**.[7]  Title 18 USC §924(c)
contains a **single** paragraph setting forth the offense of (1) using or carrying a
firearm during and in relation to a drug trafficking offense, and (2) possessing a
firearm in furtherance of any such crime.

In analyzing 924(c), the Courts have concluded that this single paragraph
section – part of a comprehensive act to regulate (some would say over-regulate)
firearms – contains two separate and distinct offenses.  **See, e.g. United States
v Timmons**, 283 F.3d 1246, 1250-53 (11th Cir. 2002); **United States v Cott**,
310 F.3d 1231 (10th Cir. 2002); **United States v Combs**, 369 F.3d 925 (6th Cir.
2004).  The **Combs** Court noted that the disjunctive separation between the
statutory subsections "belies the view that the statute simply identifies

---

[7] Mr. Lewis can find no case which discusses duplicity in the 959 context.

alternative means for committing a single offense...(and) suggests the separate prongs must have different meanings." *Id.* at 931. Likewise, the statutory languages of 924(c) – like 959 – structures the prohibited acts into distinct dependent clauses. After analyzing the meaning of the independent clauses in their grammatical and legislative context, the ***Combs*** Court concluded that "924(c) criminalizes two separate and distinct offenses." *Id.* at 933.

What does that means for an indictment which includes **both** prongs of 924(c)? In ***United States v Savoires***, 430 F.3d 376 (6th Cir. 2005) the defendant argued that the 924(c) count of the indictment improperly charged two separate offenses. Because, it is "settled" (at least in the Sixth Circuit) that 924(c) criminalizes two distinct offenses "the 924(c) charge against Mr. Savoires was clearly duplicitous." *Id.* at 379. The Court concluded that the duplicitous indictment (in combination with the erroneously unified jury instructions) "prejudiced" the defendant's "substantial rights", *Id.* at 380, constituting plain error requiring the reversal of the 924(c) conviction even without objection. *Id.*

### 5.   Conclusion

Because Lewis has been charged by means of a duplicitous indictment, the charges must be dismissed against him

**MR. LEWIS REQUESTS THE COURT HEAR ORAL ARGUMENT ON THIS ISSUE, ALONG WITH THE OTHER ISSUES SCHEDULED FOR ORAL ARGUMENT ON APRIL 16, 2008.**

**(B)**    **THE INDICTMENT IN THIS CASE MUST BE DISMISSED FOR LACK OF VENUE IN THE DISTRICT OF COLUMBIA.**

**1.    The Constitutional Venue Protections Of Article III And The Sixth Amendment**

Article III, §2, cl. 3 ("Article III") of the United States Constitution provides:

> The Trial of all Crimes, except in the Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress  may by Law have directed.

The importance of the venue provision of Article III was reinforced by the Founding Fathers through the vicinage provision of the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."[8]

Rule 18 of the Federal Rules of Criminal Procedure implements the venue protections of Article III and the Sixth Amendment by providing that

---

[8] Professor Charles Wright explains the relationship between venue and vicinage as follows:

> Strictly speaking [Article III] is a venue provision, since it fixes the place of trial, while (the Sixth Amendment] is a vicinage provision, since it deals with the place from which the jurors are to be selected. This technical distinction has been of no importance. Although in theory both constitutional provisions could be satisfied by trying a defendant in one district of a state though the offense was committed in another district, so long as the jurors were selected from the district of the crime, no such procedure has ever been attempted, and it has been considered that the trial in the district of the offense is required.

Charles A. Wright *Federal Practice and Procedure*, § 301, 579 (1969) (footnotes omitted). See also *United States v. Cabrales*, 524 U.S. 1, 6, (1998) (finding no distinction between the vicinage and venue provisions of the Constitution).

"[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in the district in which the offense was committed."[9]

The venue provisions of Article III and the Sixth Amendment, bolstered by Rule 18, were designed to protect at least three policy interests. First, the provisions protect the rights of the accused -- the accused is more likely to stand trial in a familiar venue; witnesses to the alleged crime are most likely to live in the area of the crime; tangible evidence of the crime is most likely to be found at the site of the crime; and the accused is also more likely to be tried in the area where he lives, allowing for the comfort and support of his or her family and friends and knowledge of local counsel.[10]

Second, the provisions check government power against the individual. By limiting venue, the Constitution helps prevent the federal government from gaining an undue advantage or leverage that can come with the unbridled power to choose venue in a more sympathetic state.[11]

Lastly, the constitutional provisions serve to curtail federal governmental power against individual states, allowing each state the right to try the person who actually committed the crime within the state's territory.[12]

In the words of the Supreme Court:

> Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed.

---

[9] In the words of the Supreme Court, Rule 18 "echoes the constitutional commands" of the venue provisions of Article III and the Sixth Amendment. *United States v. Cabrales*, *supra*, 524 U.S. at 6.

[10] See Note, ***Stretching Venue Beyond Constitutional Recognition***, 90 Journal of Criminal Law & Criminology 951, 995 (2000).

[11] Id.

[12] Id. at 955-956; 979-982.

*United States v. Johnson*, 323 U.S. 273, 276 (1944).[13]

    *Accord, Travis v. United States*, 364 U.S. 631, 634 (1961). See also *United States v. Goldberg*, 830 F.2d 459, 465 (3rd Cir. 1987) ("The venue provisions of the Constitution are important safeguards, protecting an accused from unfairness and hardship in defending against prosecution by the federal government"); *United States v. Spriggs*, 102 F.3d 1245, 1251 (D.C. Cir. 1996) ("The concern over a distant district is critical, as '[t]he provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place, *United States v. Cores*, 356 U.S. 405, 407 (1958)'").[14] See also *United States v. Morgan*, 393 F.3d 192, 195-196 (D.C. Cir. 2005) (conviction for receiving stolen federal property reversed for improper venue).

    It has long been settled that Article III means exactly what it says. If a crime against the laws of the United States is committed outside the limits of any State within the United States, the crime "is not local, but may be tried at such place as Congress shall designate by law." *United States v. Dawson*, 56 U.S. 467, 488 (1853).[15] However, if the crime is committed within the territorial boundaries of any State, the crime is local and must be tried in that

---

[13] The venue protections of Article III and the Sixth Amendment grew out of the Founding Fathers' complaint against the King of England, listed in the Declaration of Independence, i.e., the King's odious practice of transporting colonists "beyond the Seas to be tried" in England "for pretended offenses." The Declaration of Independence, para. 21 (1776), cited in *United States v. Cabrales, supra*, 524 at 6, n. 1. See also Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 875 (1994).

[14] *Accord, United States v. Palma-Ruedas*, 121 F.3d 841, 848 (3rd Cir. 1997).

[15] In *Dawson*, the Supreme Court noted that Article III was implemented by Congress in the first crimes act, 1 Statutes at Large, p. 114, passed April 30, 1790, which provided that "the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any State, shall be in the district where the offender is apprehended, or into which he may first be brought." 56 U.S. at 488.

State. ***United States v. Jackalow***, 66 U.S. 484, 486 (1861); ***Jones v. United States***, 137 U.S. 202, 211 (1890). See also ***United States v. Johnson***, ***supra***, 323 U.S. at 275; ***United States v. Anderson***, 328 U.S. 699, 704-705 (1946); ***Travis v. United States***, supra, 364 U.S. at 634-635; ***United States v. Cabrales***, ***supra***, 524 U.S. at 6-9.

Thus, the issue presented here is whether the crime charged in the indictment -- a § 963 conspiracy to violate § 959 -- was committed in a State or States (and not in the District of Columbia) or was committed outside the territorial limits of any State. If the former, the conspiracy must be prosecuted in the State or States where it was committed (and not in the District of Columbia); if the latter, it may be prosecuted in the District of Columbia under 21 U.S.C. § 959(c) or 18 U.S.C. § 3238.

### 2.    <u>The Conspiracy Charged Sub Judice</u>

As noted above, the indictment charges the defendants with a conspiracy under 21 USC 963 to violate 959(a), i.e., the defendants in "Columbia and elsewhere" conspired to distribute five or more kilograms of cocaine.  The indictment provides no other details of the alleged offense.  However, as noted above, the Government's declarations in support of the extradition of Lewis adds **some** meat to the "bare bones" pleading in the Indictment.

What it does flesh out is the following:  **if** drugs were actually delivered to the United States as part of **this** conspiracy, the only evidence supports a delivery to Miami, Florida. If Lewis entered the United States, it was in Miami, Florida.  Why, then, is venue laid in the District of Columbia?  Was defendant's

alleged conspiracy to distribute drugs in Columbia (as alleged), or Jamaica, Mexico, or Panama committed in a State in the United States?

### 3. **The Law of Venue in Conspiracy Cases**

(a)     The Nature of the Crime of Conspiracy

A "conspiracy is a partnership in crime." ***United States v. Socony-Vacuum Oil Co.***, 310 U.S. 150, 253 (1939). The "essence of a conspiracy is 'an agreement to commit an unlawful act.'" ***United States v.        Jimenez Recio***, 537 U.S. 270, 274-275 (2003), citing ***United States v. Iannelli***, 420 U.S. 770, 775 (1975). The agreement itself is considered "a distinct evil," which "may exist and be punished whether or not the substantive crime ensues." ***Salinas v. United States***, 522 U.S. 52, 65 (1997)."[16]

At common law because the conspiratorial agreement itself was considered dangerous to the King, irrespective of the success of the agreement, the crime of conspiracy was indictable upon the formation of the agreement and no act in furtherance of the conspiracy was required. ***Hyde v. United States***, 225 U.S. 347, 359 (1911).[17]

Although not required at common law, proof of an overt act in furtherance of the conspiracy was made an element of the early federal conspiracy statute (§ 5440 of the Revised Statutes), which element continues to be part of 18 U.S.C. § 371. See ***Hyde v. United States***, ***supra***, 225 at 357.

---

[16] See generally Developments in the Law of Criminal Conspiracy ("Developments"), 72 Harv. L. Rev. 920, 922-927 (1959).

[17] See *Developments*, *supra*, at 945-949.

In enacting the drug conspiracy statutes, 21 U.S.C. §§ 846 and 963, Congress went back to the early common-law understanding of conspiracy and omitted the overt act requirement contained in 18 U.S.C. § 371. This omission was approved by the Supreme Court unanimously in *United States v. Shabani*, 513 U.S. 10, 15-16 (1994).[18]

   (b)  Where a Conspiracy Is Deemed To Have Been Committed for Purposes of Venue under Article III

If two or more persons enter into a conspiracy in a particular State, the conspiracy is deemed to have been committed in the State where the agreement was reached because the agreement itself is the crime. Thus, the State where the conspiracy was formed is a proper forum for prosecution under Article III. *Whitfield v. United States*, *supra*, 160 L.Ed.2d 611, 620 (2005); *Hyde v. Shine*, 199 U.S. 62, 76 (1905). See *generally* Annot., *Proper Venue -- Drug Conspiracy*, 74 ALR Fed. 699 (1985).

Venue for a conspiracy prosecution is also constitutionally proper in a State where an overt act in furtherance of the conspiracy is committed, even where the conspiracy statute does not require an overt act, e.g., 21 U.S.C. §§ 846, 963, and 18 U.S.C. § 1956(h). *Whitfield v. United States*, *supra*, 160 L.Ed.2d at 620.

---

[18] *Shabani* deals with 21 U.S.C. § 846 and not § 963, the conspiracy statute involved here; however, the Supreme Court's rationale in *Shabani* appears to apply with equal force as regards § 963. See *Whitfield v. United States*, 160 L.Ed.2d 611 (2005), in which the Supreme Court unanimously held that no overt act is required in a prosecution for conspiracy to launder money, 18 U.S.C. § 1956(h).
    Several circuit courts have held that § 963 does not require proof of an overt act. E.g., *United States v. Yonn*, 702 F.2d 1341 (11th Cir. 1983); *United States v. Grammatikos*, 633 F.2d 1013 (2nd Cir. 1980); *United States v. Johnson*, 575 F.2d 1347 (5th Cir.), *cert. denied*, 440 U.S. 907 (1978).

In **United States v. Haire**, 371 F.3d 833 (D.C. Cir.2004), vacated on **Booker** grounds, 125 S.Ct. 1014 (2005), our Court of Appeals stated: "[W]e recognize the 'well established rule' that prosecutions for [a drug] conspiracy 'may be brought in any district in which some overt act in furtherance of the conspiracy was committed by any of the co-conspirators,'" citing **United States v.Lam Kwong-Wah**, 924 F.2d 298, 301 (D.C. Cir. 1991). Id. at 837.[19]

See **generally** Annot., **supra**, 74 ALR Fed. 669."[20]

**4.     The Conspiracy in this Case Was Committed in One or More States of the United States and Thus May Not Be Constitutionally Prosecuted in the District of Columbia under 21 U.S.C. § 959(c) or 18 U.S.C. 3238.**

(a) There is no question that "phone calls can constitute overt acts in furtherance of a conspiracy." **United States v. Naranjo**, 14 F.3d 145, 147 (2nd Cir. 1994). And, it is clear that making phone calls from one jurisdiction into another jurisdiction establishes venue in the latter jurisdiction "so long as [the calls] further the ends of the conspiracy." Id. **Accord, United States v. Duque**, 123 Fed.Appx. 447, 449 (2nd Cir. 2005); **United States v. Strickland**, 493 F.2d 182, 187 (5th Cir. 1974)("telephone calls and conversations to and from

---

[19] See also **United States v. Mayo**, 721 F.2d 1084, 1089-1091 (7th Cir. 1984); **United States v. Nicoll**, 664 F.2d 1308, 1311 (5th Cir. 1982); **United States v. Ramirez-Amaya**, 812 F.2d 813, 816, (2nd Cir. 1987).

[20] As noted, an overt act was not considered a necessary element of the offense of conspiracy at common law. Nonetheless, at common law, venue could be had as to all the conspirators either in the county where the agreement was formed or in any county in which an overt act was committed by any one of the conspirators. The first rule was a natural consequence of the common-law concept that the offense was deemed to have been completed with the formation of the agreement itself; the second was generally reached by regarding the overt act either as evidence of the conspiracy's existence in the second county or as a renewal and continuation of the conspiracy there.

Courts in jurisdictions that require an overt act as an element of the offense, e.g., 18 U.S.C. § 371, are in accord. Thus, in **Hyde v. Shine**, **supra**, the Supreme Court noted that venue would lie in the district where an agreement was formed even though no overt act was committed there in that the overt act requirement was considered as merely affording a "**locus poenitentiae**." 199 U.S. at 76. See **Developments**, **supra**, 72 Harv. L. Rev. at 975-976.

Atlanta were overt acts" and established venue in Northern District of Georgia); *United States v. Bartoli*, 192 F.2d 130, 132 (4th Cir. 1951)(phone call of Barton from Chicago, Illinois, to coconspirator in Huntington, West Virginia, in furtherance of conspiracy established venue in Southern District of West Virginia).[21]

The Supreme Court's decision in *Burton v. United States*, 202 U.S. 344 (1906), points up the settled principle that it is not necessary to be present in a jurisdiction in order to enter into or further a conspiracy.

In *Burton*, the defendant, who was in Chicago, sent a letter to a corporation in St. Louis, Missouri, in which he offered to perform services which were prohibited by law. The St. Louis corporation accepted defendant's offer via a telegram wired to defendant who was still out of state.

In an opinion written by Justice Harlan, the Supreme Court held that for purposes of Article III and Sixth Amendment venue, the offense was "completed" and "committed" in Missouri when the defendant's offer was accepted by telegram, notwithstanding that the defendant was not personally present in Missouri when his offer was accepted and the agreement was completed. Id. at 388. Justice Harlan summed up the rationale of the case thusly:

> The constitutional requirement is that the **crime** shall be tried in the State and District where committed, not necessarily in the State or District where the party committing it happened to be at the time. Id. at 387.    (Emphasis in original.)

---

[21] Similarly, venue for the offense of using a phone to sell drugs, 21 U.S.C. § 843(b), is deemed to lie where the call originated from or where it was received. See e.g., United *States v. Barnes*, 681 F.2d 717, 725 (11th Cir. 1982)("[w]e hold that a § 843(b) offense is 'committed' for venue purposes both in the district where the call was made and in the district where the call was received.") *United States v. Cordero*, 668 F.2d 32 (1st Cir. 1981); *United States v. Andrews*, 598 F. Supp. 297, 298 (W.D. Wisc. 1984).

See also ***United States v. Gilboe***, 684 F.2d 235, 238-239 (2nd Cir. 1982)(under 18 U.S.C. § 3237(a), venue for wire fraud prosecution was proper in Southern District of New York where there were numerous telexes and telephone calls between New York and Hong Kong and other parts of the world, even though defendant was a nonresident alien whose acts occurred outside the United States; 18 U.S.C. § 3238 not applicable because section applies only to offenses "not committed in any district," as its title indicates"). ***Accord, United States v. Kim***, 246 F.3d 186, 191-193 (2nd Cir. 2001)(under 18 U.S.C. 3237(a), defendant's causing communications to be transmitted into and out of Southern District of New York while he was overseas when he approved fraudulent invoices for payment by New York bank established venue in Southern District conspiracy prosecution, even though defendant did not personally send the transmissions and was not in New York when he caused the transactions to be made).

### 5. The Government Has the Burden To Show that Venue Is Proper under § 959(c) or § 3238

Because of the constitutional significance of proper venue, in this jurisdiction "the government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against the defendant." ***United States v. Lam Kwong-Wah***, ***supra***,

924 F.2d at 301."[22] Lewis asks the Court to be mindful of the government's burden as it considers the arguments made herein.

### (a) The Government Cannot Meet Its Burden To Show that Venue Is Proper under § 959(c) or § 3238.

There is nothing in the discovery materials to indicate that Lewis ever "set foot" in the District of Columbia, either by being physically present in the District or by making any communications, *e.g.*, phone calls, telexes, wire transfers, to or from the District.

Accordingly, the issue presented is whether the government can meet its burden to show that venue is constitutionally permissible under 21 U.S.C. § 959(c) or 18 U.S.C. § 3238.

The narcotics conspiracy statute with which defendants are charged, 21 U.S.C. § 963, does not by its terms provide for venue in the District of Columbia for one who *conspires* to violate § 959(a). The statute provides *only* that one who "conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense. . . ." In effect, the government seeks to rewrite § 963 to expand the special venue provision of § 959(c) from "acts" of "manufacture or distribution" of drugs outside the United States to "conspiracies to commit acts of manufacture or distribution" outside the United States.

---

[22] There is no federal circuit that does not place on the government the burden of showing proper venue on each count charged. See e.g., *United States v. Angotti*, 105 F.3d 539, 541 (9th Cir. 1997); *United States v. Wood*, 364 F.3d 704, 710 (6th Cir. 2004); *United States v. Salinas*, 373 F.3d 161, 163 (1st Cir. 2004)• *United States v. Robinson*, 275 F.3d 371, 378 (4th Cir. 2004); *United States v. Chin*, 378 F.3d 151, 159 (2nd Cir. 2004).

As shown above, under the law of conspiracy, defendant Lewis (thus, his co-defendants) committed the conspiracy at issue in the State of Florida.

We recognize, of course, that co-defendants may have committed overt acts **solely** outside the United States in furtherance of the conspiracy. But, as shown, given defendants' activity in the United States in furthering the conspiracy, it does not follow that their "outside-the-U.S." activity means that they did not "commit" the conspiracy in the State of Florida for purposes of Article III and the Sixth Amendment venue.

Indeed, the D.C. indictment alleges that the defendants committed the conspiracy "in Columbia, and **elsewhere**." (Emphasis added.) Under the facts of this case, the geographical "elsewhere" referred to in the D.C. indictment obviously includes Miami, Florida.

In short, the D.C. indictment itself establishes probable cause that defendants committed the § 963 conspiracy in Florida (as well as in Columbia).[23]

The Government's apparent reliance on § 959(c) for venue in the District of Columbia completely ignores the command of Article III that defendants' crime **shall** be tried in the State where the crime was committed. To have proper venue in the District of Columbia under § 959(c), the government would first have to amend Article III, Section 2, Clause 3 to read as follows:

---

[23] Although the fact of an indictment may not be considered as evidence of guilt in the eyes of the jury (Redbook Instruction No. 2.06), the return of an indictment in non-trial contexts constitutes probable cause that the accused committed the acts charged therein. *Gerstein v. Pugh*, 420 U.S. 103, 117 n. 19 (1975)(citations omitted). Courts routinely use the fact of an indictment to establish the rebuttal presumptions in the bail statute, 18 U.S.C. 3142. See *United States v. Mosuro*, 648 F. Supp. 316, 318 (D.D.C. 1986) ("indictment establishes probable cause sufficient to create a rebuttable presumption under Section 3142(e)")(opinion by J. Penn).

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State **or when committed in part within a State and in part outside any State**, the Trial shall be at such Place or Places as the Congress may by Law have directed. (Amending language in bold.)

After amending Article III, the Government would then have to turn to § 959(c) and amend it as follows:

> This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States **or committed in part outside the territorial jurisdiction of the United States and in part within the territorial jurisdiction of the United States.** Any person who violates this section **or who conspires to violate this section as prohibited by subsection 963** shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia. (Amending language in bold.)

Without the foregoing amendments to Article III and § 959(c), reliance on the current language in §§ 959(c) and 963 is unavailing.

If, in lieu of 21 U.S.C. § 959(c), the Government must rely on the venue provisions of 18 U.S.C. § 3238 to prosecute the defendants in the District of Columbia.

Section 3238, which implements Article III, deals with "offenses begun or committed upon the high seas, or elsewhere out **of the jurisdiction of any particular State or district**."[24] (Emphasis added.) Where a defendant's

---

[24] The heading of 18 U.S.C. § 3238 reads in bold: **"Offenses not committed in any District."**

criminal activity is both inside and outside the United States, as is the case here, § 3238 simply does not apply.

For example, in **United States v. Gilboe**, **supra**, the defendant, a citizen of Norway and resident of Hong Kong, entered into false contracts to ship grain while he was outside the United States. To effect his fraud, he sent and received several telexes and phone calls between New York and Hong Kong. 684 F.2d at 237-239.

Indicted in the Southern District of New York for wire fraud and transportation of funds obtained by fraud, the defendant argued that the Southern District did not have venue, claiming that under 18 U.S.C. § 3238 venue was proper only in the district in which he was arrested, the District of Connecticut. Id.

The Second Circuit rejected this claim as follows:

> But defendant relies on the wrong section; § 3238 applies only to offenses "not committed in any district," as its title indicates. But that is not the situation here. The appropriate section to apply in this case is 18 U.S.C. § 3237(a) . . . .
>
> *          *          *
>
> As already indicated, there were numerous telexes and telephone calls between New York and Hong Kong and other parts of the world. Also, the proceeds of the fraud were all transferred through New York so that "such commerce" moved "from, through, or into" the Southern District of New York. Therefore, venue was proper in that district under [§ 3237(a) and not § 3238]. Id.[25]

---

[25] See also **United States v. Kim**, **supra** 246 F.2d at 191-193.

Thus, to rely on § 3238, the government would have to rewrite the statute as follows:

> The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, **or begun or committed in part out of the jurisdiction of any particular State or district and in part in the jurisdiction of any particular State or district**, shall be in the district in which the offender, or any one of two or more joint offenders is arrested or is first brought . . . . (Amending language in bold.)

Lastly, if the government is intent on prosecuting defendants for a § 963 conspiracy to violate § 959(a), the government can readily indict the § 963 conspiracy charge in Miami, Florida, where (as shown) venue is proper for all defendants. As regards out-of-country witnesses, there is no reason why they could not come to Miami just as easily as they could come to D.C.

In sum, considering the law of venue discussed herein and the evidence relevant to venue contained in the discovery materials, we submit that the government has fallen short of meeting its burden to show that venue is proper in the District of Columbia for Lewis and these defendants.[26]

### 6.   <u>Relationship Between Venue For The Conspiracy Count And The Substantive Count</u>

### (a)   <u>Venue For Separate Counts</u>

---

[26] Irrespective of whether venue is an element of the offense that should be submitted to the jury (see discussion in *United States v. Hart-Williams*, 967 F. Supp. 73, 75-80 (E.D.N.Y. 1997)), in a case like this, where the defense has been provided with discovery and is raising the issue of venue based on the evidence in the discovery materials (assuming the truth of the facts contained therein), it is appropriate for the Court to decide the venue issue pretrial. See *United States v. Carey*, 152 F. Supp.2d 415, 419 (S.D.N.Y. 2001) ("[w]here as here, the government has provided the court with a full proffer of the facts it intends to introduce at trial to establish venue, the Court may decide whether venue is proper before trial.").

It is axiomatic that when a defendant is charged in more than one count, venue must be proper with respect to each count.  ***See, e.g. United States v Villarini***, 238 F.3d 530, 523 (4th Cir. 2001); ***United States v Corona***, 34 F.3d 876, 879 (9th Cir. 1994); ***United States v Beech-Nut Nutrition Corp.***, 871 F.2d 1181, 1198 (2d Cir. 1987).  That is, the court must conduct a separate venue analysis for the conspiracy and the substantive crimes, even if the substantive crimes are allegedly committed in furtherance of the conspiracy.  ***See, e.g. United States v Jordan***, 846 F.Supp. 895, 898 (D. Nev. 1994).  As the Fourth Circuit put it over thirty years ago:

> A decision by the United States to prosecute for conspiracy is not without some advantage to the government.  To add to the advantages already existing by engrafting a forum shopping option as to substantive offenses would, we think, go too far.

***United States v Walden***, 464 F.2d 1015, 1020 (4th Cir.) ***cert. denied***, 409 U.S. 867 (1972)

Thus, the question becomes can the government constitutionally try a defendant for a conspiracy in any venue it may try an allegedly related substantive offense, when the venue for the conspiracy lies in another district?

The Circuits seem to be split.  They have wrestled with the converse proposition – can the substantive count, even if not committed in the district of indictment, be tried where venue is proper for the conspiracy?  Let's look at the cases.

In *United States v Corona*, 34 F.3d 876 (9th Cir. 1994), the Ninth Circuit reversed a 924(c) conviction for improper venue.  The court said that venue was not proper for the substantive offense arising out of the charged conspiracy. The Ninth Circuit, adopting a "key verbs" test, rejected any *Pinkerton* theory of venue:

> What the government is essentially arguing for is a rule of law allowing venue over a substantive crime committed in furtherance of a conspiracy in any district where venue is proper for the conspiracy charge.  While such a rule might make some sense from a policy standpoint, it runs counter to the venue principles established by the Constitution, the Federal Rules of Criminal Procedure, and the federal courts.

> *Id.* at 879.

In *United States v Palma-Ruedas*, 121 F.3d 841 (3rd Cir. 1997), the venue question was, once again whether the government can try a defendant for a substantive offense in any venue where it may try a related crime.  *Id.* at 848. The Third Circuit, rejecting the contrary view (*see, infra*), agreed with the Ninth Circuit [applying the so-called "verb test", *see* 121 F.3d 841, 840 fn 4][27]  The Court noted that

> Many constitutional guarantees for criminal defendants  are inefficient and costly – the right to counsel comes to mind.  Nevertheless, these guarantees form the bedrock principles of our criminal justice system and should not be hastily balanced away.  *See United States v Johnson*,

---

[27] Although the Supreme Court cautioned against heavy reliance on a "verb test", it still retains value for application in these circumstances. *United States v Rodriguez-Moreno*, 526 U.S. 275 (1999).

> 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236
> (1944) ("If an enactment of Congress equally permits
> the underlying spirit of the constitutional concern for
> trial in the vicinage to be respected rather than to be
> disrespected, construction should go in the direction
> of constitutional policy . . ."). Thus, here, where the
> statute does not indicate the location of the crime
> for purposes of determining venue, we must strictly
> construe the verbs that define the criminal conduct
> to ensure that the defendant's Sixth Amendment
> rights are protected.

The contrary view, coming to us via the Fifth Circuit, is expressed in

**United States v Pomranz**, 43 F.3d 156 (5th Cir. 1995).  The **Pomeranz** Court

once again dealt with a 924(c) charge and concluded that a violation of 924(c) is

necessarily intertwined with a predicate act, perforce, itcan be properly tried in

the same venue as the underlying drug crime.  **Promeranz**, however, was

driven more by policy concerns than constitutional imperatives:  finding

conflicting venue provisions would require the government to "expend its limited

resources" in separate trials.  That is, costs trump constitutional requirements,

and if only a minor infringement of an accused's constitutional rights is

involved, we must give "less deference (to venue) than other constitutional

rights."

Here, the Government's **substantive allegation** – the July 22, 2005

interdiction of a "go-fast" boat in Columbian waters – may meet the 959(c)

venue provisions.  But the conspiracy allegation does not.  Thus, as shown by

the aforementioned authorities, the constitutional and statutory venue

provisions simply do not allow judicial bootstrapping of the separate cases to be tried in the District of Columbia.

### 7. (a) Lewis Entered The United States In Miami, Florida

If Lewis was acting as part of the conspiracy when he escaped from custody in Cancun and flew to Miami, he did enter the United States for 959(c) venue purpose at that time.  The government's reliance on the series of intercepted calls – from Miami, according to the Carr Affidavit – to Jamaica, assumes the very conspiracy at the heart of Count I of the indictment.  In short, assuming a narcotics conspiracy was committed by the Defendants, the venue provisions provide for the prosecution in the Southern District of Florida.

### (b)     The Alleged Conspiracy Was Furthered In Miami, Florida And Thus Was Committed in the State of Florida.

The aforementioned Carr Affidavit contains the following:

> 10.  On August 12, 2005, at 9:35 p.m., a conversation between Jeffrey LEWIS and Gareth LEWIS was recorded on 876-382-5445 and 876-383-4976 pursuant to authorization from the Jamaican Supreme Court.  I monitored the call and I relied on my memory, recordings of the call and notes of the call in the making of this affidavit.  During this conversation, Gareth LEWIS told Jeffrey LEWIS that he was hear (in Miami).  Jeffrey LEWIS told Gareth LEWIS that he needs to keep law as they might be all over the place searching for him.  Gareth LEWIS asked Jeffrey LEWIS if they have not called yet.  Jeffrey LEWIS told Gareth LEWIS that ARCHBOLD-MANNER called him last night and ARCHBOLD-MANNER told him not to worry as Gareth was fine and they had taken over the ship, therefore, Gareth would be released by Monday.  Gareth LEWIS told Jeffrey LEWIS that ARCHBOLD-MANNER is no good and if it was for ARCHBOLD-MANNER alone he would have gotten two head shots.  Gareth LEWIS told Jeffrey LEWIS that when he

spoke to Charlie Nelson, Nelson wanted to bring up the full amount. Gareth LEWIS told Jeffrey LEWIS that he told Nelson he should only bring $250,000. Gareth Lewis said that Nelson told him he would as long as it would not become a problem. Gareth LEWIS told Jeffrey LEWIS he asked Nelson why would it be a problem and if Nelson wanted him to pay for something that he never got. Gareth LEWIS told Jeffrey LEWIS that ARCHBOLD-MANNER said that he would work things out with Nelson and make Nelson respond to ARCHBOLD-MANNER instead of them. Gareth LEWIS told Jeffrey LEWIS that ARCHBOLD-MANNER's idea was to take the small one, make two runs, return them back without paying them anything or maybe $250,0000.00 and later give it back to them.

11. Based on my experience and knowledge of this investigation, I believe that Gareth LEWIS escaped to Miami, Florida from Cancun, Mexico where he had been kidnapped and held for the money that he and Jeffrey LEWIS were being forced to pay for the loss of the cocaine shipment on July 22, 2005. Gareth LEWIS was very upset that ARCHBOLD-MANNER did not help him as he expected while he was kidnapped and held by the Mexicans and the Columbians. Gareth LEWIS was more upset that the Columbians were forcing him to pay for the shipment of cocaine his crewmembers never received for further transport via Mexico to the United States. Gareth LEWIS was going to pay the Columbians $250,00.00 United States currency for them to released him and Later pay the rest of the money being demanded. When Gareth LEWIS told Jeffrey LEWIS that ARCHBOLD-MANNER idea to make "two runs" he meant to transport two separate shipments of cocaine using the same vessel, pay the Columbians $250,000.00 in United States Currency. Afterwards, ARCHBOLD-MANNER would return the vessel to Gareth and Jeffrey LEWIS.

## **CONCLUSION**

For all the foregoing reasons, Mr. Lewis asks the court to dismiss the indictment against him.

Respectfully submitted,

s/Bruce S. Harvey
LAW OFFICE OF BRUCE S. HARVEY
ATTORNEYS FOR DEFENDANT
Bruce S. Harvey, Ga. Bar #335175
146 Nassau Street
Atlanta, Georgia 30303
(404) 659-4628

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing pleading upon opposing counsel by e-filing, facsimile transmission, hand delivery, or by depositing a copy of same in the United States Mail with sufficient postage attached thereon, addressed as follows:

Patrick Hearn, AUSA
United States Attorneys Office
1400 New York Ave., NW, #8306
Washington, DC 22301

This 22nd day of February, 2008

s/Bruce S. Harvey
LAW OFFICE OF BRUCE S. HARVEY
ATTORNEYS FOR DEFENDANT
Bruce S. Harvey, Ga. Bar #335175
146 Nassau Street
Atlanta, Georgia 30303
(404) 659-4628